Richard Pope for the appellants Joe Wickersham and Carter Wickersham. On Saturday, August 10th, 2010, at the Wickersham's private secluded residence on Lake Desire, Agent Ouellette of Washington Fish and Wildlife unreasonably entered the Wickersham's property. There was no, nobody was fishing there. She had seen somebody fishing on one of the things, lots about a quarter mile away in the public park on the northwest shore of Lake Desire, and she randomly selected somebody using the best guess. She didn't know exactly which lot it was from her observations, nor did she know which one she was driving into when she drove off of Lake Desire. She picked a place which happened to not be location of whoever might have possibly been fishing. She went in the neighbor's to the north, saw, went to their driveway, knocked on their front door, looked at the public, looked at the beach front from about 100 yards away. She could clearly see both the Wickersham's lot and Wickersham's dock and the neighbor's dock from the neighbor's front door. And there was absolutely nobody down there. There was a fishing pole that was... Supposedly the same color that she saw from across the lake? It's hard to know the color, the fishing pole. She's asking what the testimony was. The testimony was by both Agent Ouellette and Carter Wickersham that there was a fishing pole without any kind of signage on it. There was certainly nobody engaging in fishing. In Tarabochia, there was a much more compelling case where the fish and wildlife agents actually saw people fishing. They unloaded their boat into a vehicle and left the dock area and they were stopped within a minute or two on public land. Let me just try to understand the Tarabochia. I thought the ruling was essentially that the statute or the Washington Code didn't authorize an automobile stop and that that was really the essence of the Tarabochia case. And we don't have anything to do with automobiles here. Here we have private property. We have their... If you would address the Tarabochia case in terms of what was actually decided vis-à-vis this fishing license statute. That it required a probable cause for stopping an automobile. That the fishing license statute only applied to people that were currently engaged in fishing. In regards to whether we look at the statute or the constitutional principles, Agent Ouellette went up to Wickersham's property, went over several levels of their rear deck. She knocked on various windows and doors on the rear of the Wickersham's house. And by her own admission yelled as loudly as she could. By Joe Wickersham's testimony, the words used were fairly profane and offensive words. That's what Agent Ouellette did. That's what prompted the dog to start barking at her. And then she shot the dog. There's some dispute between Agent Ouellette's testimony and Mr. Wickersham's, Joe's testimony. Under his testimony it would be an unreasonable shooting by the words he said and her threats. Certainly Agent Ouellette was very angry at the time. Very unreasonable kind of behavior. Even under the statute, even under any interpretation of the statute, had she gone and, you know, rang the front doorbell, even if somebody had actually been fishing and she saw them go into the house, she would only be limited to ringing the doorbell and, you know, asking them if they wanted to show their fishing license. The statute would not allow somebody to go inside the house. But here there was absolutely nobody on the Wickersham's property. She picked the wrong property. She saw a property with a beached paddle boat on it. There was no boat on the Wickersham's property or the neighbors to the north. She picked the wrong property. And that's also, you know, unreasonable to do here. Are you saying that there's an absolute prohibition for the officer to go onto the property to investigate? If the officer sees somebody actively fishing, if the officer went and looked at the... You're already saying, no, there's no absolute prohibition. Right. If somebody's seen actively fishing, Your Honor. All right. So it's not enough, then, you're saying, if she observes a fishing rod that is similar to the fishing rod she saw across the lake, and it's still unreasonable, even if people could access that dock from adjoining properties, not just from the Wickersham house. The adjoining property also has a no trespassing sign. And that's, well... The question is, as this is described, and maybe you can help us out, you know, you've got a lake, and like many of these lakes, the houses look at the lake, and the dock is on the lake. So if you want to see if there's a fishing pole, you can't see it from the front door. And the question is, given this setup, is there anything in the statute or otherwise that precludes the officer from going on the property? There would have to be, you know, reasonable, probable cause, or at least articulable suspicion. Our case, we're arguing probable cause, that there's fishing going on. Otherwise, you'd have the right to go, not only go and look at the dock areas more closely, but to go and see whether there's a fishing pole, which is something you'd have to go to the... She sees the fishing. She's across the lake. She sees the fishing. She estimates where that's going to intersect. Maybe she's wrong. We can talk about that. But she makes a best estimate of where that fishing pole is, based on how the lake is configured, and then she goes to that house. At that point, has she done anything to violate the law? Not observing the lake, it wouldn't be violating the law. If she went and knocked on a front door, presumably that could be a reasonable thing to do. Well, if she goes around the back and looks in the bushes back there, see if the person who's associated with that pole is hiding back in the bushes. That's quite a stretch. Fishing is a presumptively legal activity. Presumably everybody who does it will have a license. This is not some sort of an emergency like many of the other cases involved. Well, I don't know why they... Presumptively they'll have a license. That's the whole reason they have these enforcement officers out there, is because not everybody gets a fishing license who goes fishing. So the question is, now we've got... She didn't... There's nothing at the front door. She goes around and she sees a fishing pole, correct? So at that point, has she done anything illegal? That's what I'm trying to understand your view on. Even if you conceded that, which we don't, the fishing pole had no gear on it. It was just a fishing pole without any indication that it was actually being used for fishing. No line, no bait, no tackle, none of the accoutrements on there, just a bare fishing pole. So we understand you're saying that it's a fishing pole with absolutely no line on it? That's correct. And then the manner of going to the house, banging on the windows, yelling at the loud voice, and according to Joe Wickersham's... Well, that's all bad manners. But the question is, is it constitutionally illegal? It makes it more unreasonable, Your Honor. And even if the object was to have a regular entrance to the house, she could have easily gone, ascertained a door and knocked on it. Clearly she wasn't at the front door of the house. Did you want to save some time for rebuttal? I'll save a minute or so. May it please the Court, Assistant Attorney General Allison Zip, representing Washington Department of Fish and Wildlife Officer Wendy Ouellette. Officer Ouellette is entitled to qualified immunity for two reasons. First, none of her actions on August 14, 2010, violated the Fourth Amendment. And second, the Wickershams have failed to identify any pre-existing law that clearly notified officers Ouellette that the actions she took constituted Fourth Amendment violations. Judge McCune, you asked about Tarabokia. Tarabokia is not dispositive as far as defeating qualified immunity, because first, it was not decided until 2014. So that's four years after the events here. Second, it did hold that the 77-15-080 did not support Tarabokia. It did not support an administrative search of a car on a highway. And it focused on the roving, suspicionless vehicle stop precedent under the Fourth Amendment. It did not address the circumstances here, which is entry onto a piece of property. Officer Ouellette's entry down to the dock did not violate the Fourth Amendment. There was no reasonable expectation of privacy in the dock. It was open to public view from the lake. There were no barriers between the neighbor's property and the Wickershams' property. So it falls within the open fields doctrine of the Fourth Amendment law. And her travel down to the dock is not a Fourth Amendment violation. Certainly there's no preexisting precedent that would tell her beyond debate that she was unauthorized to go down to the dock, nor was there any law that... Well, to get down to the dock, you've got to go across the private property, right? And the dock's not in view from the front of the house or the back, depending on how you... I'll call it the highway or the street side, right? Correct. The dock's not in view... When she does get there, there's no person fishing, right? There was no person fishing. There was a fishing boat. Her authorization under the Washington Code gives her a chance to stop and check for fishing license violations for someone, quote, engaged in fishing. So there's nobody engaged in fishing down there, right? There was no one currently fishing at the time that she got to the dock. But for Fourth Amendment purposes, because there's no reasonable expectation of privacy in that dock, there's no violation of her going there. Once she goes to the dock, though, then she kind of climbs up these multiple decks, right? She does. She decided to make an inquiry at the house associated with the dock, and that was a reasonable knock-and-talk inquiry at a door that was accessible to the public. There was no barrier between the dock and the house. She walked up the slope and climbed up the decks and knocked on the door. She could hear a man in the top of the house engaged in a one-sided conversation. She knocked on the doors and reasonably believed he didn't hear her knocking. So she knocked and yelled, trying to get his attention. And that falls within the knock-and-talk exception to the Fourth Amendment. Mr. Pope concedes that if she had gone to the driveway side door, that would have been reasonable. Well, this was a door reasonably accessible from the dock, which is open to the public lake. So the door that she actually ends up communicating through is at the top deck? Is that right? She knocked at the door on what they refer to as the second-level deck and the third-level deck. Mr. Wickersham was yet a floor above. Nothing happens on the second-level deck. Nobody comes out or does anything. Nobody came out. She goes up to the top deck. It's like one of these multi-layer decks. She went up one more flight of stairs, and then, getting no answer, went down a flight of stairs, and before she had an opportunity to disengage from the knock-and-talk, the Wickersham's dog raced around the corner and attacked her. And at that point, the legal principles that are applicable shift from whether it's a reasonable knock-and-talk to her emergency response to self-defense against an attacking 80-pound Doberman. Well, before you get there, when she came on the property, she first went down to the dock. Yes. And so what I understand from opposing counsel is that the facts are undisputed that if she had observed the rod, she would see that there was no bait, maybe didn't even have a reel. I don't know what type of equipment she has, but it looked like it was an unfishable rod. Is that right? That's not the record as I understand it, Your Honor. Carter Wickersham's declaration says that there was an old, beat-up fishing pole. There's no further explanation. And Officer Ouellette said she could see the pole, and she did not check to see whether there was a line, but that's another factor she would want to discuss with the fisher. Well, are you telling me that we should look at the record this way, that there is some record evidence that it was an unfishable rod, but she didn't notice that when she was looking at it? No. There's no evidence saying it was an unfishable rod. Was it just made up? It's not in the record? I'm unaware that that is in the record. All right. Once she shot the dog, was there a seizure of Mr. Wickersham? Taking the record in the light most favorable to Mr. Wickersham, he was detained by Officer Ouellette for approximately five minutes. And what's the basis for the detention? The basis is her objectively reasonable concerns about Officer's safety. As the district court explained, she had concerns about her safety based on Mr. Wickersham's erratic behavior, and that is supported by the record evidence of, after shots were fired, no one came out of the house. She waited for a minute, and based on her experience in training, she said it was not normal that no one came out of the house. She proceeded around to the driveway side of the house, and when she met Mr. Wickersham at that door, he was, by his own description, very distraught, crying. James Rinaldi's declaration says he heard through the phone Officer Ouellette saying, calm down, calm down, take deep breaths, and Mr. Wickersham taking deep breaths. And Mr. Wickersham testified at deposition that he at the time, in the days leading up to that and at the time, believed he was the target of a nefarious law enforcement conspiracy. Does the record show that Officer Ouellette articulated a fear for her safety? Yes. Do you happen to have a cite for that handy? Yes. She first was concerned for her safety, of course, when the dog attacked her, and then she said it was not normal. After shots were fired, the man did not come out. She said it's not normal, he should have come out, I didn't know what to expect, so I still had my firearm out, that's at ER 227-28. When Mr. Wickersham came to the door, he was holding a six-inch black mobile phone, which Officer Ouellette didn't know what that was, whether it was a weapon or not, hence Mr. Wickersham says she yelled at him to drop it, drop it. So the authority for the detention was a reasonable response, narrowly tailored to her concerns of officer safety. She required him to sit in a chair on the porch for five minutes, and that was a minimal response and a minimal intrusion to her concerns, while she waited for backup to come. So it's a generalized concern based on the circumstances, because once she determined that he had no weapon, and he comes out of the house, and he's distraught because his dog is, he's concerned that his dog's bleeding out, he hadn't committed any crime, but the detention extended beyond that point. And I didn't see anything in the record that she'd articulated any fear for safety beyond that point, but you're saying given the duration of the stop, that tied back to the concern that she had identified before that point. Yes, and keep in mind that she reasonably believed that there might be someone else in the house. She didn't know if there were any other people in the house as well. She had heard a one-sided conversation and saw not only a woman fishing on the dock, but a man in white shorts, Mr. Wickersham, emerged from the house in white shorts. There could have been other people in the house she didn't know. So she was waiting for backup. I see my time is out. We ask for these reasons. We ask you to affirm dismissal on summary judgment. Thank you. Before we start, do you have a citation about the lack of fishing line, etc., on the pole? ER 89, Your Honors, declaration of Carter Wickersham, paragraph 22. There was one fishing pole on the walking portion of the dock. The pole was rusty and weathered. The reel had no fishing line in it. There was no tackle or tackle box on the dock. There was no bait or anything that would resemble someone fishing on the dock. And it goes on beyond that. As far as the seizure goes, I didn't address that in my opening, but this was an unreasonable seizure and detention of Mr. Wickersham. The idea that a telephone might somehow be mistaken for a weapon by a police officer, and then Mr. Wickersham continued to be denied access to the phone after he dropped it and the officer had an opportunity to inspect the phone, that's prima facie unreasonable. In this situation, Mr. Wickersham happened to be talking to his lawyer, of all people, which probably goes to the issue of damages from that. This is certainly detained. There was no reason for the continued detention of Mr. Wickersham once his situation was ascertained. He had no weapon. He was almost totally blind. No particular threat to the officer. That's unreasonable. And as far as this is a, again, unreasonable search of the property, if this is allowed, anybody's property would be allowed. They could keep continuing going on, which is on a fishing expedition, and we'd ask the Court to reverse and remand for a trial on these issues, Your Honor. Thank you.
judges: Murphy, McKeown, Nguyen